### DANIEL B. HATCH AND ANOTHER vs. JOHN M. DOUGLAS.

The defendant wrote the plaintiffs, who were stock brokers in the city of New York—"I want to buy say one hundred shares Union Pacific stock on margin. Will you take $1,000 first mortgage N. York & Oswego R. R. and do it?" The plaintiffs replied that they would, and at once bought the stock, and soon after sold it by the defendant's order at a profit.   Other stocks were afterwards bought and sold by the plaintiffs for the defendant under the same arrangement, resulting in a final loss, exceeding the value of the security held, and the plaintiffs sued for the balance.   Held—

1. That evidence was admissible on the part of the plaintiffs to show the meaning of the words "on margin," that term being used by stock brokers and having acquired a special and well understood meaning in their business.

2. That the contract not being one for the mere payment of differences, but the defendant having through the plaintiffs as his agents actually purchased the stock, which was delivered to them and which they were ready to transfer to him on payment of the purchase money, it was not a gaming contract.

Where a party uses a technical term which has a clearly defined and well understood meaning in the business to which it relates, and the other party, giving it that meaning, acts upon it, the former can not be permitted, to the prejudice of the latter, to say that he used it in a different sense.

The custom of stock brokers to debit and credit interest monthly, computing interest on balances, does not necessarily involve usury, as the balances may be paid.   But if the taking of such interest would be usury, it is only a question of the allowance of it by the court, and does not affect the contract for the purchase and sale of the stocks, as it is wholly outside of it.

ASSUMPSIT to recover a balance claimed to be due upon certain stock transactions; brought to the Superior Court in Middlesex County. The following facts were found by a committee:—

On the 23d day of June, 1873, the defendant requested the plaintiffs, who were brokers doing business in the city of New York, to purchase certain stocks for his account on a margin of certain securities offered, which request was made in the following letter:—

"Middletown, Conn., June 23, 1873.

"MESSRS. HATCH & FOOTE.  *Gentlemen*—I want to buy say. 100 shares Union Pacific stock on margin. Will you take $1,000 first mortgage New York & Oswego Railroad and do it? I shall only want to have on hand 100 shares at a time. If you can do this please buy 100 shares as above at the market to-morrow, 24th, and telegraph me, and I will send you the bond by express. Yours very truly,

JOHN M. DOUGLAS."

The plaintiffs complied with the request, and accepted the terms of the defendant and immediately notified him by telegraph. The defendant thereupon forwarded to the plaintiffs the bond for margin as promised, which was received and accepted by them. The plaintiffs purchased the stock for 24⅛ and carried it until July 2d, when by the defendant's order they sold it for 26⅜.

Between that time and the 23d of July, the plaintiffs, by order of the defendant, purchased in the same way for his account 100 shares of Erie Railroad stock, and two lots of 100 shares each of the common stock of the Chicago & North Western Railroad Company, and by his order sold the Erie stock and 100 shares of the Chicago & North Western, of which transactions they gave him notice as they severally occurred. The purchases were generally made below, and the sales above the figures named and authorized by the defendant, and the net profits to him to the last mentioned date were $737.50, of which he drew for $645, leaving in the plaintiffs' hands a balance of $92.50, and also the margin

bond and the remaining 100 shares of Chicago & North Western stock.

After the purchase of the last mentioned shares of Chicago & North Western stock on the 22d of July, there was no time when it could have been sold for the price ordered by the defendant. It continued like all other stocks to gradually decline until the occurrence of the panic of September, when it dropped largely and never recovered while the plaintiffs held it for the defendant, and after it was sold by them as hereinafter stated went much lower.

On the 11th of September, 1873, the plaintiffs gave the defendant the following notice:

"Sept. 11th.

"JOHN M. DOUGLAS, ESQ. *Dear Sir*—Your account requires more margin as per statement below. Please keep us supplied and oblige. Yours respectfully,

HATCH & FOOTE.

| | | | | |
|---|---|---|---|---|
| Debit balance, - | - | - | $7,100 | |
| 100 N. West, - | - | - $5,800 | | |
| 1000 Oswego bond, - | - | 850— | 6,650 | |
| | | | Dr. $450 | |
| 10 per cent. margin, - | - | 1,000—deficit, | $1,450." | |

A similar notice was also given on the 17th of September, to which the defendant replied on the 18th by the following letter:

"Middletown, Sept. 18, 1873.

"MESSRS. HATCH & FOOTE. *Gentlemen*—I was absent from town when your telegram came and this A. M. sent you message saying 'Hold on.' I will back up all I owe your house and pay interest until you are entirely out. At present things are pretty well locked up. I have securities but not such as you would take, and could send the cash if money was not quite so tight with some of our institutions. You will please hold on and not get alarmed. I can pay every-thing even with the North Western common stock sunk out of sight. Please be easy; you know the writer will back you

for his account, and will send you money after a little if things do not improve in Wall Street.

Yours respectfully,   JOHN M. DOUGLAS."

The defendant failed to make good his margin, or to make any arrangement with the plaintiffs, and on the 30th of October they informed him that they saw no other way for them but to sell him out and collect the balance by law, and November 18th gave him the following notice:

"New York, Nov. 18, 1873.

"JOHN M. DOUGLAS, ESQ.   *Dear Sir*—We desire to give you notice that on Wednesday, Nov. 26th, 1873, we shall cause to be sold at public auction in this city, at the Exchange Sale Room, No. 111 Broadway, by Adrian H. Muller & Son, auctioneers, the following described stock and bond, namely: 100 shares Chicago & North Western R. R. Company common stock, and $1,000 New York & Oswego Midland R. R. 7 per cent. first mortgage bond, the same being held by us as security for money advanced to you.

Very respectfully,   HATCH & FOOTE."

And on November 26th, they sent the following notice:

"New York, Nov. 26, 1873.

"JOHN M. DOUGLAS, ESQ.   *Dear Sir*—We have sold for your account at public auction through Adrian H. Muller & Son, $1,000 N. Y. & Oswego Midland R. R. first mortgage 7 per cent. bond at 55, to H. Marks, and 100 shares Chicago & North Western R. R. common stock at 46¾ to J. Pangborn. The above securities will be delivered on Friday and the proceeds placed to your credit, and we shall look to you for the payment of the balance due us.

Yours respectfully,   HATCH & FOOTE."

The defendant had on the morning of that day telegraphed the plaintiffs in the following words: "Please postpone sale of stocks."

When the defendant made his first order and opened his account with the plaintiffs he made no inquiry as to the effect of a loss beyond the value of his margin, or of the custom

of New York brokers with regard to such a result. He supposed he was in no event subjecting himself to risk of loss beyond the value of the margin. But prior to his letter of September 18th he knew or had reason to suppose that he was risking whatever loss might occur in the transactions. He had previously dealt with other brokers in the same way, but his margin had not been absorbed. The plaintiffs supposed he made the order, and commenced the account, with reference to the general practice and custom of the business in similar transactions, and they had no reason to suppose otherwise. A mere payment by the defendant of the differences in the value at the time of purchase and time of sale would have satisfied the plaintiffs' demand, if this had been the only transaction, and the interest debt balance had been paid.

The plaintiffs did not transfer or tender a transfer to the defendant of any of the stocks purchased for his account, and were not requested by him to do so, and neither party expected or contemplated such transfer or delivery. The stocks were purchased for the defendant and paid for by the plaintiffs, and received under blank powers of attorney for transfer, and held by the plaintiffs subject to the defendant's order to sell, and would have been transferred and delivered to the defendant on request and the settlement of his account. The several purchases and sales were actual as between the plaintiffs and the persons of whom they purchased and to whom they sold; and as between the plaintiffs and defendant, the plaintiffs in buying and selling were acting for and executing the orders of the defendant, and only charged the usual commission. The plaintiffs did not hold and carry, and sell for the defendant, the identical shares they purchased for his account. They were at the same time dealing in a similar way in the same stocks for other parties, and when ordered to sell a certain number of shares of a particular stock which they were carrying for parties, did so without reference to the person for whom those specified shares were bought; in other words, they did not keep stocks purchased for one person, distinct from the same kind of stocks purchased

for another; but they always from the time they purchased the last hundred shares of Chicago & North Western stock for the defendant until they were sold, held an equivalent number of shares in a single certificate, and could and would at any time, if requested by the defendant, have sold or delivered to him that precise amount on settlement for the same.

The plaintiffs were in the habit, when necessary, of borrowing money for their own use on the security of stocks they were carrying for other parties, and for that purpose hypothecated the defendant's Chicago & North Western stock, but they could at any time have released it from hypothecation by the substitution of any other marketable securities of equal value, and were at all times in a condition to have redeemed the defendant's stock if there had been any necessity, or occasion, or request for it. The plaintiffs claimed the right to hypothecate in that way and for that purpose, subject to the defendant's right to settle his account and demand the delivery of his stock. There was no intention to deliver to the defendant the shares of stock purchased for his account unless he requested it, but the intention of the plaintiffs was to purchase and sell from time to time as ordered by the defendant, and carry his stocks on the security of the margin, required by the custom to be kept at not less than ten per cent. unless otherwise specified, until a settlement was made according to the usage of the business.

The defendant by his counsel objected to all evidence respecting usage and margin, but it was admitted; and upon such evidence it was found that all the transactions of the plaintiffs with the defendant and his stocks, including their hypothecation and sale at auction and the demand for the remaining balance, were in all respects in conformity with the uniform and established usage of brokers in New York.

The custom of the plaintiffs and other New York brokers in such transactions is to make monthly debit and credit interest balances, by which the interest is compounded. And the undertaking of the plaintiffs in this transaction was in accordance with and in pursuance of that custom in the

computation of interest on their account against the defendant. The plaintiffs claimed the right to that mode of computation with the defendant, and so entered it in their books, and in their bill of particulars; but on the trial waived and withdrew that part of their bill of particulars, and claimed only a running interest balance at seven per cent. per annum, in which manner the committee computed it.

On the foregoing facts the balance of principal due the plaintiffs November 28th, 1873, was found to be— $2,005.75
Interest at 7 per cent. to February 28th, 1878, 4

years and 3 months, -        -        -        -        596.71

$2,602.46

The defendant remonstrated against the acceptance of the report on sundry grounds, but the court (*Granger, J.,*) overruled the remonstrance, accepted the report, and rendered judgment for the plaintiffs for the sum found due by committee. The defendant brought the record before this court by a motion in error.

*S. L. Warner* and *S. A. Robinson*, for the plaintiff in error.

1.   The contract was a wager contract. As such it is void by the statute. Gen. Statutes, p. 228, sec. 1. And such a contract is void at common law. *Wheeler* v. *Spencer*, 15 Conn., 31. The courts have been loth to fix absolutely what a wager contract is. And for the same reason they have refused a definition of fraud. No court however has hesitated to declare that "a contract by which two or more persons agree that a certain sum of money or other thing shall be paid or delivered to one of them, on the happening or not of an uncertain event," is a wager. Bouvier Law Dict., *Wager*. The case finds "*that a mere payment by the defendant of the differences in the value at the time of purchase and time of sale, would have satisfied the plaintiffs' demand, if this had been the only transaction and the interest debt had been paid.*" With reference to other transactions or purchases the record discloses that they were of the same char-

acter and purchased in the same way. With reference to the "interest debt" we will only say, that if it grew out of a wager contract it can stand no better than the principal sum. It is also found that the defendant, prior to and at the time of the purchases, supposed that he was in no event subjecting himself to liability beyond the margin. Also that there was no intention to deliver to him the shares of stock purchased for his account, unless he requested it. It is not claimed that such request was ever made; nor is it claimed that the parties ever contemplated that such request was to be made. On the contrary "the plaintiffs' intention was *to purchase and sell from time to time, as ordered, on the security of the margin.*" The margin is the stake, and *differences*, not stock, are the subject of the demand. The finding of the court that the plaintiffs during all the time of this transaction were dealing with other parties in this stock and held an equivalent number of shares in a single certificate, and could or would have *sold or delivered* to him that precise amount, is not an important fact against the defendant, for, first, it discloses that the stock was not *sold*, and, secondly, that it was to be at the defendant's option whether to take it. So long as the subject of the contract was the difference in the market value of the stock, the plaintiffs' capacity or willingness *to deliver or sell* the stock is immaterial. There must have been an actual intention to deliver. *Barry* v. *Croskey*, 2 Johns. & Hem., 1; *Lyon* v. *Culbertson*, 4 Am. Law Times, 57. If there had been no fluctuations of the price, there could have been no obligation, if the commission and interest balances had been paid. But as such a contract is void in law, it is idle to discuss the question whether commissions or interest could result. The following authorities amply sustain us in our general position:—*Story* v. *Salomon*, 71 N. York, 420, 422; *Bigelow* v. *Benedict*, 16 N. York Supreme Ct., 429; *Yerkes* v. *Salomon*, 18 id., 471; *Unger* v. *Boas*, 13 Penn., 601; *Brua's Appeal*, 55 Penn. St., 298; *In re Chandler*, 13 Am. Law Reg., 310; *In re Green*, 7 Biss., 338; *Rudolf* v. *Winters*, 7 Neb., 125; *Cassard* v. *Hinmann*, 14 How. Pr. R., 84; *Rumsey* v. *Berry*, 65 Maine, 570; *Grizewood* v. *Blane*, 11 Com. B., 525.

2. The contract was usurious and for that reason void. By the law of New York "all bonds, notes, conveyances, contracts or securities whatsoever (except bottomry bonds,) and all deposits of goods, whereby there shall be reserved, or taken, or secured, or agreed to be reserved or taken, a greater rate of interest than seven per cent. per annum, are absolutely void." The case here discloses a contract made "according to the general practice of this class of stock purchases;" also that the general practice of New York brokers in such transactions is, to make on their books monthly debits and credits of interest, by which the interest is compounded. And it is found that "the undertaking of the plaintiffs in this transaction was in accordance with and in' pursuance of that custom, in the computation of interest. Here then was a contract which at its inception called for a greater rate of interest than seven per cent. per annum. It' is not a contract to carry the stocks at a *lawful* rate for a given time with interest compounded *after due*. Nor is it a contract to pay *after it has been due and compounded.* ` Nor is it a contract to carry the stock for any specific time after the interest could be considered as due. By its terms Douglas had the right to continue the loan by *keeping up the margin.* It is *simply a method of computing interest before it is due, giving a greater rate than seven per cent. when due.* Such a contract as this is plainly within the spirit and letter of the prohibition of the statute. But there is still another objection. Here the contract calls for specific interest; it was interest compounded monthly. The contract being express no implication can result. The law never implies a contract where the parties have stipulated. If interest compounded on monthly balances can not be collected on the ground of illegality, on what principle can any interest be charged? Is it so that, where parties have contracted illegally, the court can set up an entirely different contract on the same subject matter, of a legal character?

3. The evidence of the usage of New York brokers as to holding a party liable for a loss beyond the amount of the margin, was improperly admitted. The custom was not

universal, it was that of the New York brokers. Universal custom has the obligation and effect of law, and parties are charged with notice, but the only ground on which the evidence of custom of a particular section, or locality, or trade, or business, is admissible, is that the parties who made the contract were both cognizant of it and made their agreement with reference to it. When either party has no notice it is inadmissible. *Kirchner* v. *Venus,* 12 Moore P. C. C., 361; *S. C.,* 5 Jurist N. S., 395; *Rushforth* v. *Hadfield,* 7 East, 224; *Walls* v. *Bailey,* 49 N. York, 464. The case here shows that this usage was not known by the defendant; on the contrary, he supposed he was risking in no event any more than his margin. But it will be said that prior to September 18th he had reason to know his risk was greater. What if such was the case? His contract was already made and his obligation was complete. His letter of September 18th is an answer to a specific claim for margin, and cannot without violence to all construction be claimed to extend to anything else, *and all he supposed he owed was margin.* Besides, if this contract was void on any ground no agreement enforceable at law could grow out of it. From such foundation no obligation could arise. *Cannan* v. *Bryce,* 3 B. & Ald., 179; *Thacker* v. *Hardy,* L. Reps., 4 Q.B. Div., 685; *Rudolf* v. *Winters,* 7 Neb., 129; *Fareira* v. *Gabell,* 89 Penn. St., 89. The agreement was for purchase "on margin." The contract, by its terms, limits the defendant's liability, unless some custom is admissible to change the force of the terms of the contract. This expression means on the liability, credit and risk of the margin—and that alone. Usage, custom or dealings cannot be given in evidence to enlarge the scope of a written agreement when its terms are plain and unambiguous. Here it changed the margin liability to that of the individual.

*S. E. Baldwin* and *A. W. Bacon,* for the defendants in error.

1. The validity of the transaction, in all its parts, is to be determined by the laws of New York, where the defend-

ant's proposition was made and accepted, and everything was to be and was done. 2 Parsons on Cont., 582; *Trevor* v. *Wood*, 36 N. York, 307.

2. The transaction was a lawful one. The plaintiffs actually paid for and received transfers of all stocks which they bought for the defendant, and these would have been delivered to him at any time, if he had wanted them and tendered the money advanced for their purchase. It was not a contract to pay "differences." In such a contract there are no actual purchases made or contemplated, but a mere series of bets on the course of the market, without any actual transactions. *Bigelow* v. *Benedict*, 70 N. York, 202; *Schepeler* v. *Eisner*, 3 Daly, 11; *Rumsey* v. *Berry*, 65 Maine, 570. The custom to hypothecate the stocks purchased, as security for moneys lent to the broker to use in carrying them, was not an unreasonable one. *Sturges* v. *Buckley*, 32 Conn., 18; *Nourse* v. *Prime*, 7 Johns. Ch., 69, 83; *Wood* v. *Hayes*, 15 Gray, 375. There was no reason for keeping the stocks bought for the defendant separate from those bought for other customers, so long as no injury has been thereby occasioned to the defendant. *Horton* v. *Morgan*, 19 N. York, 170; *Wynkoop* v. *Seal*, 64 Penn. St., 361.

3. Evidence of the meaning of the word "margin," which has a technical and peculiar sense as applied to stock transactions, was plainly admissible. *Nelson* v. *Sun Mutual Ins. Co.*, 71 N. York, 453, 458. The defendant, having used this technical term in contracting with a firm of brokers, cannot set up that he did not understand its meaning. *Sturges* v. *Buckley*, 32 Conn., 18; *Leach* v. *Beardslee*, 22 id., 404, 406, 408; *Bridgeport Bank* v. *Dyer*, 19 id., 136, 139; *Whitehouse* v. *Moore*, 13 Abb. Pr. R., 142; *Pollock* v. *Stables*, 12 Q. Bench, 765. And it is found that he did know or have reason to know what it meant, before writing the letter of September 18th, the promises in which are ample to support this action. *Durant* v. *Burt*, 98 Mass., 161.

4. The custom of New York brokers to make monthly debit and credit interest balances, which the plaintiffs pursued in their original account with the defendant, is a reasonable

one, and gives an equal advantage to each party. It was not meant in this case as a cover for usury. *Hart* v. *Dewey*, 2 Paige, 207; *Stewart* v. *Petree*, 55 N. York, 621; *Meeker* v. *Hill*, 23 Conn., 574, 578. And all claim for compound interest was waived on the trial; and none is included in the judgment.

CARPENTER, J. The authorities are clear that a contract relating to stocks or other commodities, to be performed at a future day, by which the parties contemplate only the payment of the difference in the market value by one or the other as the case may be, is a mere gaming contract and void. So if parties in form contract to sell goods to be delivered in the future, the seller in fact having no goods, and the parties not intending an actual delivery, but contemplating merely a payment of the difference between the market value on that day and the agreed price, it is a gaming contract and cannot be enforced.

Contracts of this nature however are distinguishable from speculating contracts. A man may legitimately buy goods or stocks intending to sell in a short time and take advantage of an advance in the price if there is one. In such a case he takes the risk of a decline, but that does not make it a gambling contract. And he may purchase goods at a fixed price to be delivered at a future day, if the parties intend an actual delivery and acceptance. The actual intention may be difficult to prove or disprove; but when once the fact is established one way or the other, there is no difficulty in applying the law.

Now there are in the transactions between these parties some of the elements which are usually found in a gaming contract. For instance, it is pretty evident that the parties did not contemplate that the stock should be actually transferred to the defendant; but he would have been satisfied with the receipt of the difference between the price paid and the price received, less interest and commissions, if the price advanced, and expected to pay that difference if the price declined. To that extent it was a contract for the payment

of differences. But it was more than that. The defendant through his agents, the plaintiffs, actually purchased the stock, and there was an actual delivery—not to the principal, but to the agents for the principal. The plaintiffs advanced the money and held the stocks in their hands as security. The plaintiffs were ready at any time to transfer the stock to the defendant on payment of the purchase money. The import of the finding is, and we must so regard it, that it was an actual and bonâ fide employment of the plaintiffs to purchase stocks, and not a mere formal employment designed to cover a betting operation. It does not appear that the plaintiffs assumed any risk. They were entitled to their commissions and interest on their advancements whether the stocks went up or down. The most that can be said of them is, that they knew that the defendant was speculating, and that they advanced him money for that purpose. But that was neither illegal nor immoral.

The circumstances relied on to prove the illegality of this contract are consistent with the claim that it was a legitimate business transaction. It is probably true that dealing in stocks "on margin," as it is called, is fraught with much evil. It encourages speculation, and induces many to engage in it who would not otherwise have the requisite means. In that way many people and business generally suffer more or less. But it is an evil that existing laws do not reach. No case has been cited which declares such a contract illegal. If we should so hold it would be difficult if not impossible to draw the line between legal and illegal transactions.

We are of the opinion that there are not in the case before us sufficient reasons for declaring the contract illegal.

The defendant raises a question of evidence. In his letter of June 23d he writes:—"I want to buy say one hundred shares Union Pacific stock on margin." What does that mean? Those unacquainted with the business would not understand its meaning from the language. It is not to be presumed that the court understood it. The plaintiffs produced witnesses, who were familiar with the business, and who knew from experience and observation the meaning

attached to the words, to prove their meaning. The defendant objected, but the court admitted the evidence, and we think properly. *Nelson* v. *Sun Mutual Ins. Co.*, 71 N. York, 453. It was in the nature of a technical phrase, the meaning of which must be understood before the court could know what the contract between the parties really was.

But it is said that the parties did not understand the phrase alike, the defendant supposing that he risked nothing but the margin, while the plaintiffs understood that he assumed a personal liability as well. The language is that of the defendant. He used a phrase peculiar to the plaintiffs' business, knowing that they would understand its meaning as used in that business. In such cases if the parties did not understand it alike it must be interpreted in the sense in which the plaintiffs understood it. If the defendant chooses to use a technical term which has a clearly defined and well understood meaning in the business to which it relates, and the plaintiffs giving it that meaning act upon it, he cannot be permitted, to the prejudice of the plaintiffs, to say that he used it in a different sense. He left it to be interpreted by usage, and by that interpretation he is concluded. For that purpose usage was properly shown.

But it is said that it is the custom of brokers in their business to debit and credit interest monthly, computing interest on balances. This, the defendant says, being compound interest, infects the contract with usury. The contract in its terms is silent on the subject of interest. It is only because the contract was to be performed in conformity with the uniform and established usage of brokers in New York that this claim has any foundation. It will be observed that the usage does not necessarily call for compound interest. If dealings do not extend beyond the period of one month, or if the monthly balances are paid, there is no compound interest. It is only when dealings continue from month to month that it is called for. The question then is this:—Is a contract usurious which is legal on its face, but which is to be performed according to a local custom, when that custom in one contingency calls for compound interest? We think

VOL. XLVIII.—17

Hatch v. Douglas.

not. The vice of usury is not certain; it is only possible. In contracts of this nature the question of interest pertains rather to the remedy than to the contract. It is incidental, and not of the substance of the contract. It is allowed not strictly as interest, but in the nature of damages, although it is commonly called interest, and the amount is determined by the rate of interest where the contract is to be performed.

Viewed in this light the question is whether that part of a custom which contravenes the policy of the law will be enforced. But that question is out of the case, as the plaintiffs waived their claim for compound interest, and judgment was rendered for simple interest only.

' There is no error in the judgment.

In this opinion the other judges concurred; except GRANGER, J., who having tried the case in the court below, did not sit.