CHARLES F. W. DILLAWAY, and others,

*vs.*

GEORGE A. ALDEN.

Kennebec.   Opinion December 13, 1895.

*Contracts.   Wagers.   Brokers.*

Contracts between a stockbroker and a customer for buying or selling stocks upon a margin in the hope of profit from the fluctuation in price, are not illegal, if either party expects the final balance to be liquidated by a delivery of the remaining stocks.

If, however, neither party expects any delivery of stocks at any time, but both parties understand that only money is to be paid from one to the other according to changes in the market price the arrangement is a mere wager upon changes in price and is illegal.

In this case there were numerous dealings with reference to changes in price, but the broker always kept command of sufficient actual stock, to make delivery when demanded, and at the end of the last deal, did transfer the remaining stock to his customer's order. Such transactions were not wagers.

ON REPORT.

This was an action of assumpsit on the defendant's promissory note for $12,586.42, given at Boston, July 3, 1893, to the plaintiffs, Dillaway, Starr & Co., on six months. Plea, general issue, and the following brief statement of defense:

"That the note described in the plaintiffs' writ was given

without consideration and is null and void; that it was given by way of settlement and in consideration of contracts made by and between the plaintiffs and the defendant, by way of gaming and wagering, contrary to the form of the statute then and still in force (in the Commonwealth of Massachusetts, where said contracts were made and executed), in such case made and provided, and contrary to law in such case; that prior to the making of such note, said plaintiffs, as brokers, residing and doing business in the city of Boston and Commonwealth of Massachusetts, contracted with the defendant to buy and sell, in the Commonwealth of Massachusetts, upon credit and margins, certain securities and commodities; that neither the plaintiffs nor defendant at the time such contracts were made, had any intention to perform said contracts by actual receipt or delivery of such securities or commodities, and payment of the price therefor, and that they in fact were never delivered or paid for, nor did either ever intend that the other was bound to deliver the same, but that in all said contracts the real intent of the parties was to wager on and to speculate in the rise and fall of such securities and commodities, and that the one party was to pay and the other to accept the difference between the contract price of such securities and commodities at the date fixed for executing said several contracts, or when said contracts should be closed; and that there was no intention that said securities or commodities be bought outright; and that such contracts were all gambling transactions and illegal and void; and that said note was given for such credits and securities and transactions, so arising in buying and selling such securities and commodities, within said Commonwealth of Massachusetts; and if the plaintiffs paid any money for or on account of the defendant, for which said note was given, they did so knowing that such money was lent and advanced to and for the defendant on account of, and to be used in, gaming and illegal transactions, in which the plaintiffs and defendant were connected, and that the plaintiffs themselves made the application of such moneys, according to their own judgment, in the promotion and furtherance of such gaming and illegal transactions."

" The defendant further averred that he frequently forbade the plaintiffs from buying and selling of said securities and commodities on the defendant's account, but the plaintiffs disregarded his directions so made, and fraudulently, and for their own benefit, and for the commission which the said plaintiffs would receive in such transactions as brokers, fraudulently continued to buy and sell said securities and commodities."

*S. S. Brown,* for plaintiffs.

*Edmund F. and Appleton Webb,* for defendant.

Counsel cited : R. S., c. 125, § 10 ; Mass. Stat. 1890, c. 437 ; *Kennedy* v. *Cochrane,* 65 Maine, 594 ; *Bond* v. *Cummings,* 70 Maine, 125 ; *Banchor* v. *Mansel,* 47 Maine, 60 ; *Irwin* v. *Williar,* 110 U. S. 499 ; *Tyler* v. *Carlisle,* 79 Maine, 210 ; *Franklin Company* v. *Lewiston Inst. for Savings,* 68 Maine, 47 ; *Rumsey* v. *Berry,* 65 Maine, 574 ; *Cunningham* v. *National Bank of Augusta,* 71 Ga. 400 (S. C. 51 Am. Rep. 266) ; *Bruce's Appeal,* 55 Pa. St. 298 ; *Dyer* v. *Curtis,* 72 Maine, 185 ; *Marble* v. *Grant,* 73 Maine, 423.

The gambling nature of the transaction is shown plainly from the fact that during all these transactions, aggregating more than half a million in a few months, not a single share of the stock was ever delivered to the defendant or seen by him, or paid for by him ; neither have the plaintiffs ever expected payment or delivery.

SITTING : PETERS, C. J., WALTON, EMERY, HASKELL, WHITEHOUSE, WISWELL, JJ.

EMERY, J.    The material facts found by the court are these : The defendant had an intimate personal acquaintance with one Brown, a member of the firm of Francis B. Dana & Co., stockbrokers in Boston.    March 29, 1892, the defendant turned over to this firm two hundred shares of St. Louis Southwestern Railway stock, and $2000 of Maine Central Railroad five per cent bonds.    The stock was the residuum of some prior stock transactions with or through Brewster, Cobb & Estabrook, another brokerage firm in Boston.    The Maine Central bonds

had been deposited with this latter firm as collateral security for margins. All were turned over to Francis B. Dana & Co., on the defendant's order.

From April, 1892, to March, 1893, Francis B. Dana & Co., apparently bought and sold various stocks on the defendant's account. Their books show numerous such transactions. The defendant appears to be charged with amounts paid for stocks plus commissions, and credited with proceeds of stock sold minus commissions. Some few of these seeming transactions were by direct, special instructions of the defendant. The mass of them, however, were under what Dana & Co. claimed to be general authority from the defendant to buy and sell for him at their discretion.

In April, 1893, as the result of these various stock transactions (actual or seeming) the books of Dana & Co. showed a balance against the defendant of some $12,500, for which according to their books they held as security three hundred and fifty shares of various stocks, and the original $2000 of Maine Central bonds. In the meantime Brown had withdrawn from the firm of Dana & Co., and become a member of the plaintiff firm of Dillaway, Starr & Co., of Boston, also stock-brokers. At Brown's request, the defendant gave the last firm written instructions to pay the balance due from him to Dana & Co. and take over his securities in their hands. This the plaintiffs did, April 13, 1893, paying Dana & Co., $12,511.41. At the request of Mr. Dillaway, the defendant on July 3, 1893, gave the plaintiffs his note for that sum and interest, collaterally secured by the stocks and bonds they had received from Dana & Co. This action is upon that note.

I. The defendant contends and testified that he did not authorize Francis B. Dana & Co. or Brown to buy or sell stocks on his account except in a very few specific instances, and further that he gave repeated instructions to them to cease operations and close his account. Brown testified to the contrary. The defendant, however, at the end instructed the plaintiffs to pay the balance of all the transactions and then gave his note for that balance so paid. So far as the plaintiffs

are concerned the defendant must be held to have ratified the doings of Dana & Co.

II. The defendant again contends that the transactions with Dana & Co. which created the balance against him, and which are the consideration of his note, were wagering contracts and void by the law of Massachusetts where they took place, and by the law of Maine where the balance is sought to be recovered,—that Brown knew of this illegality, and that his knowledge affects the plaintiff firm of which he was a member. Waiving the question whether this illegality and Brown's knowledge, if established, would be a defense to this note against the plaintiffs, we proceed to inquire whether such illegality is established.

The purchase and sale of stocks for profit,—contracts to buy stocks to sell again on a hoped-for-rise in price,—contracts to sell stocks on a hoped-for-fall in price,—are not illegal. Speculation is not necessarily gambling. A purely speculative contract is not necessarily a wagering contract. Speculation and speculators may serve a useful purpose in providing a continuous market, and in differentiating a special class to assume the hazards of fluctuations in prices, and thus relieve the regular trader or producer of that risk. So long as there is a real transaction,—so long as something is actually bought or sold, or is actually contracted for, either for purchase or sale,—there is no wagering, not even if the thing contracted for does not then exist. Nor does a subsequent change in, or cancellation of, the contract affect its original validity.

When, however, there is no real transaction, no real contract for purchase or sale, but only a bet upon the rise or fall of the price of a stock, or article of merchandise in the exchange or market, one party agreeing to pay, if there is a rise, and the other party agreeing to pay if there is a fall in price, the agreement is a pure wager. No business is done,—nothing is bought or sold, or contracted for. There is only a bet.

Efforts are often made to give such a bet the appearance, if not the nature of a business transaction. The parties often go through the form of buying or selling, or contracting to buy or

sell, with the mutual understanding, however, that the contract is not to be performed, but is to be cancelled by the payment of the amount of the change in market price. In such case it is apparent there is no real business transaction but only a bet, complicated in form perhaps, but of an unconcealed nature.

Such contracts are to be held valid, however, unless the nullifying understanding is mutual and is made apparent. The transactions between Dana & Co. and the defendant were upon their face actual transactions, actual buying and selling stocks for the defendant's account. The appearance upon the books of Dana & Co. is of actual transactions. The only evidence tending to show that these transactions were not actually had, that there was no actual buying or selling as entered on the books, is the personal testimony of the defendant himself. That testimony, however, falls short of showing a mutual understanding, an understanding by Dana & Co. as well as by himself, that he was to acquire no right to any stocks bought, and was not to deliver any stocks sold. Brown, on the other hand, testifies that every item charged against, or credited to, the defendant on the books of Dana & Co. was an actual purchase or sale on the Boston Stock Exchange according to the rules and customs of that Exchange,— that every transaction was followed by a delivery of the stock certificates from the seller to Dana & Co. or to the purchaser from Dana & Co.

It is not claimed that there was a manual transfer of stock certificates each way, each time, and for every share bought or sold during the day, or that they were transferred in the name of the defendant. The labor involved in such frequent transfers and re-transfers seems to have been avoided by a sort of clearing-house system among the brokers in the stock exchange, by which when there were numerous transactions both ways in the same stock, only the balance would be delivered and paid for as between the brokers. But under this system each broker had each day within his immediate control, stock certificates to represent the purchases made for his principal. It also appears that these stock certificates were rarely, if ever, assigned to or in the name of the principal, but were assigned to the broker,

or in blank. These certificates were not kept in the broker's vaults, but were used by him as instantly redeemable collateral for money borrowed to make advances and carry on business, the broker, however, always keeping within his instant control enough certificates to turn over to his principal on demand, or to deliver to a purchaser when ordered to sell. Brown testified that Dana & Co. always had within their immediate control certificates representing all the stocks appearing to the credit of the defendant on their books, and could and would have delivered them on demand. When demand was finally made by the order of April 10th, 1893, they at once delivered certificates for all the stocks then standing to the defendant's credit.

These devices of the brokers to facilitate their transactions, may bear to the superficial observer the appearance of jugglery rather than of regular buying, selling and delivering; but a deeper and longer look will discover that they are appropriate means for the quick and economic transaction of large volumes of legitimate business. All through the various deals is the intention to finally strike a balance, and liquidate it by an actual transfer of stock certificates. At the end when the deals or transactions are finally closed, and the balance is struck, the broker is ready to deliver the requisite stock certificates of his principal's order. In this case at the end of some two years of numerous operations in the stock-market, the stocks represented in the final balance were actually delivered by the transfer of the stock certificates to the defendant's order. The defendant received these certificates as the final result of his stock operations. He has shown that these operations were disastrous to him, but he has not shown that they were not what they purported to be, viz., actual buying and selling stocks through a broker. Hence his defense fails.

For authorities in support of this statement of the law see *Rumsey* v. *Berry*, 65 Maine, 570; *Barnes* v. *Smith*, 159 Mass. 344; *Bibb* v. *Allen*, 149 U. S. 481; *Bangs* v. *Hornick*, 30 Fed. Rep. 97; *Bigelow* v. *Benedict*, 70 N. Y. 202; *Hatch* v. *Douglass*, 48 Conn. 116. This last case is almost parallel with the case at bar.

*Defendant defaulted.*