Coös,     }
Nov. 3, 1903. {

## WHEELER *v.* METROPOLITAN STOCK EXCHANGE.

Where the parties to a contract for the purchase and sale of stock do not contemplate an actual delivery of the property, but their mutual understanding is that one party is to pay to the other the difference between the contract price and the market price at the time the trade is closed, the transaction is a wager within the meaning of section 18, chapter 270, Public Statutes ; and any money or property deposited, paid, or delivered in pursuance of such contract may be recovered of the party by whom it was received.

The intention and understanding of the parties to a written contract may be shown by parol evidence, for the purpose of establishing that the agreement is void and of no legal effect, even if the terms of the writing are thereby contradicted.

Evidence that a party to whom a release was given suppressed and misstated material facts during preliminary negotiations warrants a finding that such release was obtained by fraud.

ASSUMPSIT, to recover money paid as margins upon stock gambling contracts. Plea, the general issue and a release. Replication, that the release was obtained by fraud. Trial before *Wallace*, C. J., at the November term, 1901, of the superior court. This case and ten others against the same defendants were tried together; and in five of them there were no releases.

For some time prior to December 18, 1899, one Letourneau was in business as a stockbroker in Berlin. The defendants, who were stockbrokers in Boston, furnished a private wire from their office to that of Letourneau, who did most of his business with them. The plaintiff gave orders to Letourneau to sell or buy a certain number of shares of stock, making written contracts with him in which no reference was made to the Metropolitan Stock Exchange. Each contract specified the margin paid and how much the plaintiff was willing to pay to protect it. If it was a purchasing contract and the market price fell more than the amount of the margin, or if it was a selling contract and the market price rose more

than the margin paid, the transaction was closed unless a further margin was advanced. If in a purchasing contract the price of the stock rose, or if in a selling contract the price fell, the plaintiff could at any time order the deal closed, and would receive as his profit the difference between the contract price and the market price at that time, less the commission retained for doing the business. The contracts were made as though the stock was to be actually bought or sold, and if the plaintiff had desired he could have had the shares delivered to him in case of a purchase; but it was the understanding of both the plaintiff and Letourneau that there was to be no stock delivered at any time. Both understood that they were buying and selling on margins exclusively, and that the only result of the contracts would be the payment of money from one to the other in settlement of the differences between the price named in the contracts and the market price.

No evidence was introduced on the part of the defendants; but from the course of dealing with Letourneau they must have known and understood that ninety-nine per cent of their business with him was buying and selling stocks on margin. When Letourneau received the plaintiff's orders he transmitted them to the defendants by telegraph, and also remitted all money received on the contracts. It was understood between Letourneau and the defendants that all trades sent by him to them were to be kept good by the payment of all the margins called for on them; and that if Letourneau failed to do this all trades could and would be closed out, regardless of the fact that some customers had paid their margins. The plaintiff did not so understand, but believed that if he advanced the margins required by his contracts he would be protected, whether others paid or not. Letourneau was not in fact the agent of the defendants, but their correspondent. From the method of conducting the business, which was known to the defendants, the plaintiff understood and had a right to understand that Letourneau was their agent; and upon such understanding he made the contracts with Letourneau and paid money to him. All the money received from the plaintiff was sent to the defendants, who paid one half of the commission to Letourneau or gave him credit therefor; and they received the money knowing that it was paid to Letourneau while he held himself out as their agent.

About December 18, 1899, Letourneau failed to pay the margins called for on all the contracts, and they were closed out by the defendants. The margins which the plaintiff was called upon to pay a few days before amounted to $720. Letourneau would not accept the money then, for he knew that unless he could pay a large indebtedness to the defendants the plaintiff would not be protected. The plaintiff was not aware of this fact. He was informed that

Letourneau was having some trouble with the defendants, but he did not know that his contracts were thereby affected. The defendants subsequently agreed with Letourneau to receive the $720 and to reinstate all the plaintiff's transactions. The stock named in the plaintiff's purchasing contract rose in value, entitling him to a profit. He thereupon ordered the trades closed out, and Letourneau failed. At the time of the failure the defendants telephoned Letourneau to keep his office open until matters could be adjusted, and a few days later they sent one Mepham to Berlin for that purpose. Mepham, as a representative of the defendants, informed the plaintiff that his trades were all in Letourneau's name, that they had long been closed out because the margins were not paid, and that they were not reinstated by the payment of $720, but that new trades were made on which there was a much smaller profit than the plaintiff expected. He said to Letourneau in the plaintiff's presence that the former was not an agent of the defendants, to which Letourneau said, "I can't help it; I was your agent." Mepham asked, "Did n't we notify you to take that agency business off your letter-heads?" Letourneau replied, "I can't help it; I did n't take it off." The plaintiff believed Mepham's statements and acted upon them in accepting $915.16 which the defendants were willing to pay for a release; and he executed and gave to them a release of all claims to that date.

At the close of the evidence the defendants' motion for a nonsuit was denied, subject to exception. The court made the following findings and rulings:

1. Letourneau was not in fact the agent, but the correspondent of the defendants; but he held himself out as the defendants' agent, with their knowledge, and they received the money on the contracts made by him as their agent with that knowledge, and in that way ratified them and are estopped to deny his agency in these transactions.

2. The releases were obtained by fraud.

3. Although the contracts between the plaintiffs and Letourneau were for the future sale of stocks, yet both parties, at their inception and thereafterwards, understood that there was to be no delivery of stock, but only a settlement of differences between the price named in the contract and the market price at some future time.

4. These contracts are held to be gambling ones within the provisions of sections 15–18, chapter 270, of the Public Statutes; and it is further held that under said statute the plaintiffs can recover the amounts they have lost in these stock-gambling transactions with the defendants, and judgment is therefore ordered for the plaintiff in each case for the amounts heretofore found that they have lost.

The defendants excepted to the last ruling, and also to the admission of oral testimony as to the intention and understanding of the parties.

*Foster & Hersey* (of Maine), *Harry G. Noyes*, and *Chamberlin & Rich* (*Mr. Chamberlin* orally), for the several plaintiffs.

*Drew, Jordan & Buckley* (*Mr. Buckley* orally), for the defendants.

Parsons, C. J.   The superior court ruled that the defendants were estopped to deny Letourneau's agency for them in the transactions upon which the action arises.   There is no contention that this ruling was erroneous in law or unauthorized by the facts. The case, therefore, upon the main question, may be considered as though the plaintiff's dealings were directly with the defendants.

It does not appear that any question arising upon such contracts for the purchase or sale of stocks as are described in the case has heretofore reached this court for decision.   In other jurisdictions the questions now raised have often been presented and decided.   In such cases it has been held that contracts for the purchase and sale of merchandise for future delivery at a fixed price are valid if the parties contemplate the actual delivery of the subject of the contract.   But when the parties do not in fact intend such actual delivery, but their real purpose, whatever the language of the contract, is to adjust the same at some future time by the payment of the difference between the price named in the contract and the market price at the time, the generally accepted doctrine in this country is that such contracts are mere wagers, and are null and void.   Benj. Sales, *ss.* 82, 83, 541, 542; *Dilloway* v. *Alden*, 88 Me. 230,—33 Atl. Rep. 981; *Harvey* v. *Merrill*, 150 Mass. 1; *Wagner* v. *Hildebrand*, 187 Pa. St. 136,—41 Atl. Rep. 34; *Jamieson* v. *Wallace*, 167 Ill. 388,—59 Am. St. Rep. 302, note 308; *Irwin* v. *Williar*, 110 U. S. 499, 508, 509.   Any money or property deposited, paid or delivered by any person upon a wager or its loss may be recovered by such person; and any person receiving any money or property won by him upon any wager is liable to the person losing the same in the proper action.   P. S., *c.* 270, *ss.* 16, 17.   Under these provisions, the only question is whether the money lost by the plaintiff was deposited, paid, or delivered to the defendants upon a wager.

It is not necessary to rely upon the general current of authority that such contracts are wagers, for the legislature has specifically defined the contracts upon which the right of action depends.   "Any contract or agreement for the purchase, sale, loan,

payment, or use of money or property, real or personal, the terms
of which are made to depend upon, or are to be varied or affected
by, any uncertain event in which the parties have no interest ex-
cept that created by such contract or agreement, shall be deemed
a bet or wager." P. S., c. 270, s. 18. The contracts described in
the case, as the parties understood them, were mere wagers within
the terms of this statute. The margin deposited by the plaintiff
was the plaintiff's bet or stake. The uncertain event, upon which
depended the result of the transaction, was the market price of the
stock when the transaction was closed. The plaintiff could order
it closed at any time, when the amount due him from the defend-
ants was determined by the relation between the market price and
the price named in the contract. The plaintiff made or lost as the
market price was greater or less, accordingly as he had bought or
sold, as his action was termed; while if the market price varied
from the contract price against the plaintiff to the amount of the
margin, the transaction was closed and the plaintiff's stake was
lost. The finding, that in a purchasing contract the plaintiff could
have had his stock delivered if he wanted it, is immaterial, because
the real contract, as understood by the parties, was that no stock
was to be delivered at any time.

The defendants excepted to all oral testimony as to the inten-
tion and understanding of the parties. The purpose of the evi-
dence was to prove a fact which, if proved, established that the
contract was void and never had any legal effect. This fact could
be proved by any competent evidence, even if it contradicted the
recitals of the writing. 1 Gr. Ev., s. 284; Chit. Cont. (10th Am.
ed. ) 119; *Collins* v. *Blantern*, 2 Wils. 341, 350, 352. Their in-
tention being material, the parties themselves could testify thereto.
*Moore* v. *Davis*, 49 N. H. 45, 56. The intention of the parties in
cases like the present is to be found from all the circumstances
surrounding the transaction. Evidence of any facts having pro-
bative force upon the issue is competent. *Jamieson* v. *Wallace*,
167 Ill. 388, 396,—59 Am. St. Rep. 302; *Sprague* v. *Warren*, 26
Neb. 326,—3 L. R. A. 679; and cases above cited.

It is found that the releases pleaded by the defendants were
obtained by fraud. There is no specific exception to this finding;
but it appears that at the close of the evidence a motion for a non-
suit was denied, subject to exception. Under this exception, the
only objection urged is as to the sufficiency of the evidence to
authorize the general finding of fraud. A general verdict implies
the finding of all facts necessary to support it of which there is
evidence; and hence a general finding made by the court or a ref-
eree must stand unless some of the special facts found are incon-
sistent therewith. *Concord Coal Co.* v. *Ferrin*, 71 N. H. 33;

*Strafford Savings Bank* v. *Church*, 69 N. H. 582; *Noyes* v. *Patrick*, 58 N. H. 618. A part of the evidence is reported, and certain facts are found. No objection is made to the sufficiency of the testimony to authorize the evidentiary findings made. The only question, therefore, for consideration is whether from the facts and evidence reported the inferences necessary to sustain the finding of fraud could reasonably be made. Fraud may consist either in the assertion as true of that which is known to be false or not known to be true as to some matter material to the contract, or in the intentional concealment of some material fact. *Perry* v. *Hardy*, 71 N. H. 151, 152; *Hanson* v. *Edgerly*, 29 N. H. 343, 358; *Hoitt* v. *Holcomb*, 23 N. H. 535, 552. "Where one party to a contract stands by and allows the other to enter into a contract under a delusion of the existence of which he is aware, and which he might have removed, the contract is void." Chit. Cont. (10th Am. ed.) 756.

Briefly, the facts are that the plaintiff dealt with Letourneau understanding that he was the defendants' agent, and that his contracts were actually with the defendants, although in form they were with Letourneau alone. Letourneau had represented himself as the defendants' agent upon printed matter sent out from his office. In October, 1898, the defendants wrote to Letourneau objecting to such representation, but he nevertheless continued with the defendants' knowledge, and without further objection from them so far as appears, to hold himself out as their agent until the time of his failure, about December 18, 1899. The defendants then sent one Mepham to Berlin to represent them and to adjust matters. The parties did not undertake to adjust the claim made in this suit, but did attempt to settle the matters arising out of their wager contracts; and in such adjustment the defendants secured the release of all claims, which is now pleaded. Whether such a release, obtained under such circumstances, would be an answer to the claim made in this suit, is a question which has not been raised. The controversy then between the parties was as to the amount due from the defendants. If they were responsible as principals for Letourneau's contracts, a much larger sum was understood to be due than if they were not. At an interview between Wheeler (the plaintiff) and Letourneau, Mepham said Letourneau was not their agent. Letourneau replied, "I can't help it; I was your agent." Mepham said, "Didn't we notify you to take that agency business off your letter-heads?" Letourneau said, "I can't help it; I didn't take it off."

From this evidence it would not be unreasonable to find that Mepham's purpose was to induce Wheeler to believe that the defendants had not so conducted as to render themselves liable as

principals for Letourneau. The representation that they had for-bidden Letourneau to so act, omitting the material facts that the notice had been given long before and to the defendants' knowledge had not been complied with, had a direct tendency to deceive the plaintiff; and it cannot be said that it would be unreasonable to infer that the half-truth was stated for the purpose of deceiving Wheeler, and that the omission of the material facts qualifying the statement was intentional. Furthermore, it is found that the defendants received of Letourneau $720 of the plaintiff's money, upon the agreement that they would reinstate all of the plaintiff's transactions. It does not appear that anything beyond the agreement of the defendants to reinstate the plaintiff's transactions upon the receipt of the money was necessary to effect such reinstatement as between the parties. If that be so, the statement of Mepham to Wheeler that his trades were not reinstated was a misstatement of a material fact and evidence of fraud. If, however, the agreement to reinstate contemplated the performance of some act which the defendants agreed to do but did not do, to which Mepham's denial related, the evidence, if it does not amount to falsification as to the material fact, has some tendency to establish want of good faith on the part of the defendants in the whole transaction, and bears upon the honesty of Mepham's conduct in the settlement. Upon the case, it might fairly be found that although the statement as to agency in fact was true, nevertheless Mepham knew that Wheeler executed the release under a delusion as to the facts created by his representation, and hence that the contract was void.

The defendants further object that it does not appear that the plaintiff has offered to return the sum received by him under the release. It is apparent that this objection was not raised at the trial. If then made, it might have been obviated by proof of facts establishing that such offer was not necessary as matter of law, or such orders could have been made as would require the plaintiff to do what he equitably ought to do. Upon the facts, it does not seem that any order would be required. *Mead* v. *Welch*, 67 N. H. 341, 342.

*Exceptions overruled.*

All concurred.