MARTIN *et al. v.* CITIZENS BANK OF MARSHALLVILLE.

No. 9483.  NOVEMBER 15, 1933.

*M. Felton Hatcher* and *R. F. Scarborough,* for plaintiffs.
*C. L. Shepard,* for defendant.

BELL, J.  In the year 1925 T. J. Martin and his sister, Miss Lula Martin, jointly obtained from the Citizens Bank of Marshallville two loans, one in the sum of $7500, and the other in the sum of $1600, executing their promissory notes therefor, and securing the same by deeds to real estate.  In 1932, the notes being past due and unpaid, the bank sought to exercise powers of sale contained in the security deeds, and was running an advertisement accordingly. Whereupon T. J. Martin and Miss Lula Martin filed a suit in equity to enjoin the sale; and after an interlocutory hearing the presiding judge refused an injunction, and the plaintiffs excepted. The plaintiffs contended that they were entitled to an injunction for the following reasons:  (1) That the property conveyed as security was a part of the estate of their father, who had died many years before, and that under the terms of his will the share of Miss Lula Martin consisted of a mere life-estate in trust, which, although she was sui juris, she could not convey; and (2) that the money was loaned to the plaintiffs to be used by them in speculation in Florida real estate, which amounted to a gambling transaction, and that the bank through its officers and directors was so connected with the design and purpose of the loans as to render the notes void and uncollectible.

We do not deem it necessary to set forth the terms of the will under which the plaintiffs acquired their respective interests in the property in question, or to pass upon the question so ably

discussed by their counsel as to the nature of the estate bequeathed to Miss Lula Martin. At the times of the transactions in question she had attained her majority, and was laboring under no disability. She executed the security deeds in her individual capacity, and is now seeking to avoid them in like capacity. Whether or not it be true that under the terms of the will she acquired only a life-estate in trust, she is estopped by her deed to dispute the title which she purported to convey, and can not enjoin the sale under a power of sale contained in the security deeds.

In *Boisclair* v. *Jones,* 36 *Ga.* 499, it was said: "The mortgagor executed the mortgage upon the property as his own estate, to secure the payment of his individual debt. In a proceeding to foreclose the mortgage as against him, he can not be permitted to allege that the property so mortgaged by him as his own individual property was not his property, but was trust property which he had no right to mortgage. The maker of a deed can not claim adversely to his deed, but is estopped from denying his right to sell and convey. Revised Code, section 2657 [Civil Code of 1910, § 4189]. When the mortgage shall be foreclosed against the mortgagor, and the property sold, or offered for sale under the judgment of foreclosure, and other parties have either a legal or equitable interest in it, they can assert their rights to it at the proper time, and in the proper manner, if they shall think proper to do so. *McDougald* v. *Hall,* 3 *Ga.* 174. Whatever right or title the mortgagor conveyed to the mortgagee by his mortgage deed may be foreclosed as against him in this proceeding, there being no other parties before the court but the mortgagor and the mortgagee." In *Hall* v. *Davis,* 73 *Ga.* 101, it was held: "The defendant was estopped by his deed from denying title to the mortgaged premises, and neither he nor the court, at his suggestion, could intervene for the protection of the rights of a third person, who would not be bound by a judgment to which he was not, and could not be made, a party." Many cases to the same effect might be cited. Cf. *Walker* v. *Walker,* 139 *Ga.* 547 (5) (77 S. E. 795) ; *Allen* v. *Lathrop,* 46 *Ga.* 133 (2), 137; *Sullive* v. *Jones,* 61 *Ga.* 676 (3) ; *Mims* v. *Wight,* 78 *Ga.* 12 (3 S. E. 447) ; *American Freehold Land Mortgage Co.* v. *Walker,* 119 *Ga.* 341 (2) (46 S. E. 426) ; *Moran* v. *Bank of Forsyth,* 129 *Ga.* 599, 602 (59 S. E. 281). The true nature of the estate held by Miss Lula Martin was not open to in-

quiry at her instance in the present case, and afforded no ground for enjoining the sale on the petition filed.

■ The plaintiffs alleged in effect that the sums of money were borrowed for the purpose of gambling in options and mortgages on Florida real estate, as members of a pool or syndicate formed through the influence of the president and certain directors of the bank, and that the funds were in fact so used and were lost by the plaintiffs. Whether or not these with the other *allegations* were sufficient to show that the funds borrowed were intended to be used in a gambling transaction within the meaning of the laws of this State, we are satisfied that the *evidence* did not establish such fact. In this view it is unnecessary to consider any question as to knowledge or participation by the bank. We may concede that almost any subject-matter, even an interest in real estate, may become the basis of a gambling contract; but the evidence in the present case shows nothing more in that direction than that the plaintiffs and several other persons formed a syndicate for the purpose of dealing in Florida real estate during the period of the so-called boom, and that the members of this syndicate actually invested the sum of $65,000 in options and executory contracts, which sum they finally lost. The fact that in certain contracts issued to T. J. Martin, as purchaser for himself and others of described real estate, there were stipulations that the sums of money paid by him in cash should be retained by the sellers as liquidated damages in case of default by the purchaser in completing the contracts, did not convert the contracts into gambling transactions; and this is true even though the stipulations may have called for penalties as distinguished from liquidated damages. The mere insertion of a provision for a forfeiture does not constitute gambling, nor make of the agreement a gambling contract. Civil Code (1910), § 4391. Nor should an instrument be condemned as a gambling contract merely because it conveys to one of the parties nothing more than an option to buy at a certain price. Contracts known as options are not to be classed as gambling contracts under the laws of this State, nor are they otherwise condemned as unlawful for any reason.

If the members of this syndicate were engaged in gambling or in the making of gambling contracts, with whom were they so engaged, and what were the terms and conditions of the wager? A

party can not gamble with himself, and it does not appear that the agreements made by the syndicate with other parties were not intended on both sides to be performed in good faith in accordance with the terms and stipulations thereof. In Brau's Appeal, 55 Pa. 298, referred to in *Cunningham* v. *National Bank,* 71 *Ga.* 400, 404 (51 Am. R. 266), and in *Anderson* v. *State,* 2 *Ga. App.* 1, 24 (58 S. E. 401), it was said that "Anything which induces men to risk their money or property, without any other hope of return than to get for nothing any given amount from another, is gambling, and demoralizing to the community, no matter by what name it may be called." But it was further said in that case that "Bona fide time contracts about real subjects of purchase and sale are valid, notwithstanding they may be affected by the rise and fall of the market." In Gaw v. Bennett, 153 Pa. 247 (34 Am. St. R. 699), a wagering contract was defined to be "one in which the parties in effect stipulate that they shall gain or lose upon the happening of an uncertain [certain?] event in which they have no interest except that arising from the possibility of such gain or loss." In an ordinary contract both of the parties may ultimately gain by entering into the agreement. In a gambling contract one of them is certain to lose. By the terms of such a contract the consideration must fall to the one or the other upon the determination of the specified event. Rehberg v. Tontine Surety Co., 131 Mich. 135 (91 N. W. 132) ; State v. Shaw, 39 Minn. 153 (39 N. W. 305) ; 14 Am. & Eng. Enc. Law (2d ed.) 582. But it is unnecessary, in this connection, to attempt an exhaustive definition of a gambling contract. It is enough to show that the transactions under consideration do not fall within any class of contracts condemned by the laws of this State as founded upon such illegal consideration.

The Civil Code (1910), § 4253, declares that a contract which is against public policy can not be enforced, and mentions, among others, wagering contracts. In Dillaway v. Alden, 88 Me. 230, 234 (33 Atl. 981), it was said: "A purely speculative contract is not necessarily a wagering contract. Speculation and speculators may serve a useful purpose in providing a continuous market, and in differentiating a special class to assume the hazards of fluctuations in prices, and thus relieve the regular trader or producer of that risk. So long as there is a real transaction,—so long as some-

thing is actually bought or sold, or is actually contracted for, either for purchase or sale,—there is no wagering, not even if the thing contracted for does not then exist. Nor does a subsequent change in, or cancellation of, the contract affect its original validity. When, however, there is no real transaction, no real contract for purchase or sale, but only a bet upon the rise or fall of the price of a stock, or article of merchandise in the exchange or market, one party agreeing to pay if there is a rise, and the other party agreeing to pay if there is a fall in price, the agreement is a pure wager. No business is done—nothing is bought or sold, or contracted for. There is only a bet." *Forsyth Manufacturing Co.* v. *Castlen,* 112 *Ga.* 199 (2) (37 S. E. 485, 81 Am. St. R. 28). The Civil Code (1910), § 4256, provides that gambling contracts are void, and all evidences of debt or incumbrances or liens on property, executed upon a gaming consideration, are void in the hands of any person. The evidence failed to show anything in the nature of gaming contracts within the purview of this section. *Lasseter* v. *O'Neill,* 162 *Ga.* 826 (135 S. E. 78, 49 A. L. R. 1076).

The Civil Code (1910), § 4258, defines what is commonly called dealing in futures, and declares in effect that contracts for the delivery of wheat, cotton, corn, and other commodities shall be unlawful only when it is not in good faith intended by the parties that an actual delivery of the articles or thing shall be made. As to a contract for the sale of personal property, before the agreement may be declared void as a wagering contract "it must appear not only that the seller had, at the time of entering into the transaction, no intention of delivering the [property], but also that the buyer knew the seller's intention in the premises." *Richter* v. *Kilpatrick,* 143 *Ga.* 470 (85 S. E. 319). The absence of any purpose to deal with the actual property marks the distinction between legal and gambling contracts in reference to the sale of personal property. If the parties to the contracts in relation to the Florida real estate had intended that the values should be determined by some prescribed method at a certain time, and that money settlements would then be had according to such values, without any sort of conveyance of the property, the contracts might, perhaps, be considered as constituting gaming transactions. In such a case there would be some analogy to a contract for the sale of personalty where it was the intention of the parties that there should be no

actual delivery, but that on the day fixed for such delivery there should be a settlement of differences based upon the market value of the goods on that date. Cf. *Stewart* v. *Postal Telegraph-Cable Co.,* 131 *Ga.* 31 (61 S. E. 1045, 18 L. R. A. (N. S.) 692, 127 Am. St. R. 205) ; *Robson* v. *Weil,* 142 *Ga.* 429 (2) (83 S E. 207) ; *Kilpatrick* v. *Richter,* 146 *Ga.* 277 (91 S. E. 51) ; *Forsyth Mfg. Co.* v. *Castlen,* supra. But the evidence did not tend to show the existence of any such plan or scheme, and did not otherwise disclose anything in the nature of a wagering or gambling contract. That the parties were among those who sought riches in an orgy of speculation, and sustained losses, does not alter the case. In Webster's New International Dictionary, 2006, speculation is defined as "The act of speculating, by engaging in business out of the ordinary, or by dealing with a view of making profit from conjectural fluctuations in the price rather than from earnings or the ordinary profit of trade, or by entering into a business venture involving unusual risks, for a chance of an unusually large gain or profit."

There is a broad distinction between a gambling contract and one which is merely speculative in purpose. Speculation is not per se unlawful. Any one may buy any sort of legally recognized property for a rise in value; and this is true of options and equities, as well as fee-simple titles. Under the law of this State, the speculations by these parties did not constitute gambling; and in no view of the evidence were the plaintiffs entitled to defeat payment of the notes or avoid the security deeds on the ground that the sums of money were borrowed for an unlawful purpose with the knowledge and connivance of the defendant bank. Gregory *v.* Wendell, 39 Mich. 337 (33 Am. R. 390) ; Kirkpatrick *v.* Bonsall, 72 Pa. 155.　　*Judgment affirmed. All the Justices concur.*